## WHITTLESEY v. SMITH.

CONTRACTS—CORPORATIONS — SERVICES — PERFORMANCE — DIRECTED VERDICT.

> Where plaintiff sued on a contract, entered into with defendant corporation through its president, for the compensation he was to receive for procuring the underwriting of bonds to be issued by defendant for the purpose of liquidating its floating indebtedness, and consent of the necessary two-thirds of the stockholders to the issuance of said bonds, to be obtained by plaintiff, was never procured, and the bonds were never issued, a verdict for defendant was properly directed by the court below.

Error to Wayne; Van Zile, J. Submitted October 9, 1916. (Docket No. 6.) Decided December 22, 1916.

Assumpsit by Matthew B. Whittlesey against J. Henry Smith and Peter Smith & Sons Company, a corporation, for services rendered. Judgment for defendants on a directed verdict. Plaintiff brings error. Affirmed.

*J. O. Murfin*, for appellant.

*Yerkes & Cochran* (*Edward Donnelly*, of counsel), for appellees.

Plaintiff is an attorney at law. Defendant J. Henry Smith is president and principal stockholder of the other defendant, Peter Smith & Sons Company. The corporation was capitalized for the sum of $500,000; $250,000 common and $250,000 preferred. All the common stock except qualifying shares was owned by the defendant J. Henry Smith. All the preferred stock was owned by persons other than J. Henry Smith. The preferred stock had been issued for the purpose of raising money to erect a ten-story building on the southwest corner of Griswold and State streets, in the city of Detroit. The cost of the building proved to be largely in excess of the estimate, and in the fall of 1913 the defendant Peter Smith & Sons Company found itself indebted to one or more banks in the sum of upwards of $200,000 upon short-time paper. In this predicament it is the claim of plaintiff that defendant J. Henry Smith appealed to him: *First*, to secure a tenant for a portion of the property; *second*, to effect a sale of the entire property for the sum of $500,000; and, lastly, to undertake to formulate a scheme for the funding of the floating debt for more than $200,000, with a provision for payment at a later date. For this service it is plaintiff's claim he was promised by defendant J. Henry Smith the sum of $5,000. With reference to the bargain the plaintiff testified in part as follows:

"I was not able to sell the building for that price. And then in further conversation with Mr. J. Henry Smith, his financial condition, or the condition of his company was developed, and I learned how much that they owed at the bank. I suggested to him that there was a way of refunding that indebtedness and carrying it over a period of years, to enable them to pay

it off a part at a time, and not to be called on it—to be called for the whole of it any one time. In the meantime it might be possible thereafter to sell the building. We talked over the assets of the corporation; he told me what assets they had. He gave me a so-called trial balance about that time. * * * I suggested on those two assets, as well as the earning power of the grocery company, that he could put a $250,000 bond issue as a lien on the building, with the collateral of the lease, or his interest in that lease as security, and sell that as present bonds.

"Q. What did Mr. Smith say with respect to that suggestion?

"A. After talking it over he asked me if I could secure somebody to buy those bonds. I told him I thought I could. Then we discussed the matter further, and it developed it would be necessary, in order to put a lien on the assets, to get the consent of two-thirds of the preferred stockholders. I made the agreement with him that I would secure the underwriting. By that I meant I would secure somebody to buy the bonds in one block at a discount, with his co-operation to get the consent necessary of two-thirds of the preferred stockholders to allow the loan being put on this building, to use that lease interest as collateral to this bond issue.

"Q. Was there anything said about what he would pay you as your compensation for this work?

"A. He told me if I negotiated it $5,000. * * *

"Q. As I understand the proposition that you made was this in substance: That if the company, through its preferred stockholders, would agree to make this bond issue, you would find somebody who would purchase the bonds; isn't that, in substance, the agreement?

"A. The proposition I made was, I stated this morning, was this: That I could find an underwriting for $250,000 of the bonds secured by the assets that Mr. Smith agreed to put up; that I would get the consent, with his co-operation, of two-thirds of the preferred stockholders. I did not get the consent of the preferred stockholders. I didn't have his co-operation, either."

The record discloses that the consent of only about $40,000 of the $250,000 of preferred stock was secured for the bond issue, and that the preferred stockholders met on November 3, 1913, in response to a call for the purpose of authorizing the directors and officers of said company to issue $250,000 worth of bonds, but, instead of authorizing said issue, they appointed a committee to examine into the financial affairs of the defendant Peter Smith & Sons Company, which committee was to report later. This committee reported on January 12th, and at an adjourned meeting on January 19th passed the following resolution:

"Resolved that the proposition to issue bonds contained in the original notice of this meeting be not approved."

Later they recommended that, upon receipt of an assignment by J. Henry Smith of his interest in a certain lease on State street, the consent of the preferred stockholders should be given to the issuance of $250,-000 worth of bonds, of which $200,000 should be pledged with the creditor banks as collateral to the indebtedness; the remaining $50,000 to be used at the discretion of the board of directors for the security and retirement of other current indebtedness of the corporation.

After plaintiff's failure to secure the assent of the requisite amount of preferred stock for the issuance of the bonds, which happened in December, 1913, the plaintiff took no further part in the negotiations between the preferred stockholders and the defendants.

At the conclusion of the plaintiff's case the court directed a verdict for the defendant in the following language:

"The contract never was in writing, a valid contract; that there were certain things to be done which had to be accomplished before a contract could be said

194—Mich.—32.

to be made, among them the obtaining of the consent of two-thirds of the preferred stockholders. Now, the proofs in the case show that they never did that, and more than that, that the proposition that was made here was rejected by the preferred stockholders as well as the common stockholders, and that there was never any basis of the contract; that the contract was never made; that under none of the counts of the declaration could the plaintiff recover except there was a contract actually existing; that is to say, under the *quantum meruit*. It is not such a case as would support such a recovery, and I therefore direct in this case that you find a verdict for the defendant, no cause of action."

In this court appellant argues his case under four assignments of error which may be consolidated into one, namely, that the court erred in holding the plaintiff could not recover and in refusing to submit the question to the jury.

BROOKE, J. (*after stating the facts*). Plaintiff in the court below and in this court distinctly disclaims any right to a judgment against defendant J. Henry Smith. It appears to be his claim that, as president and principal stockholder of the defendant Peter Smith & Sons Company, J. Henry Smith had authority to enter into the contract in question on behalf of the corporation, and that the plaintiff in reliance upon said contract entered upon and accomplished the substantial performance thereof. His testimony seems to indicate that in their negotiations he was misled by statements of J. Henry Smith with reference to the terms upon which the preferred stock had been sold. He further seems to charge the defendant Smith with a failure to co-operate with him in securing the consent of the preferred stockholders to the bond issue. While these claims might require consideration in an action in which the plaintiff sought to recover from Smith damages growing out of Smith's failure to carry out his agreement with the plaintiff, we are unable to

see how they are pertinent to the consideration of the liability of the corporation to the plaintiff under the alleged contract.

Assuming the contract to have been made between the plaintiff and defendant corporation acting through J. Henry Smith, and further assuming that such contract was not *ultra vires* the authority of Smith as president of the corporation, we are forced to the conclusion that the learned circuit judge was correct·in directing a verdict for the defendant upon the ground that there was no performance on the part of plaintiff. Both he and Smith knew that in order to effect a bond issue which would take precedence as a security of the preferred stock it would require the assent of two-thirds of such preferred stock. This assent plaintiff undertook to secure, and himself testifies that he failed to secure it. Plaintiff says, "He [Smith] told me if I negotiated it, $5,000," in reference to a question as to what his compensation was to be.

It is, we think, clear from this record that he not only failed to secure the assent of the preferred stockholders which was a condition precedent to the issuance of the bonds, but he likewise failed to secure an underwriting of the bonds through Mr. Seagraves or anybody else. The most that can be said of his arrangement with Mr. Seagraves is that the president of the First National Bank had agreed to finance Mr. Seagraves in the purchase of the bond issue at a discount of 10 per cent. if the statement of assets and liabilities of Peter Smith & Sons Company could be verified by an accountant. It does not appear that the defendant corporation was advised that the bonds would have to be discounted to the amount of 10 per cent. or that it assented to such discount; neither does it appear that any verification was made by the bank of the financial statement of the defendant corporation. The arrangement made by the plaintiff with

Mr. Seagraves and the bank was, at most, preliminary, tentative, and certainly unenforceable.

Judgment is affirmed.

STONE, C. J., and KUHN, OSTRANDER, MOORE, and STEERE, JJ., concurred. BIRD and PERSON, JJ., did not sit.